IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Plaintiff/Respondent, | § | |
| | § | |
| V. | § | CR. No. C-07-357 |
| | § | C.A. No. C-09-122 |
| NOE SALINAS, | § | |
| Defendant/Movant. | § | |

## MEMORANDUM OPINION AND ORDER
## DENYING MOTION TO VACATE,
## SET ASIDE OR CORRECT SENTENCE AND
## ORDER GRANTING CERTIFICATE OF APPEALABILITY

Pending before the Court is Movant Noe Salinas' ("Salinas") motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255. (D.E. 104, 105.) The Court ordered the United States to respond and the United States filed a response on August 18, 2009. (D.E. 113.) The United States' response included an affidavit from Salinas' trial counsel, Lionel Aron Pena, which the Court has also considered. (See D.E. 113 at Exhibit 1.)

Salinas has filed two letters with the Court since that time, which the Court construes as a reply and a supplemental reply. (D.E. 114, 115.) The Court has considered both of these documents.[1] Then, on February 10, 2010, the Clerk received from Salinas a "Motion for Release Pending Appeal" in which he asks for the Court to resolve his § 2255 motion or release him pending its resolution. (D.E. 116.) That "motion for release" is DENIED,

---

[1] The Court has also received additional correspondence from Salinas' mother, several of which enclosed letters from Salinas. None of these have yet been docketed, although Salinas' letters do not respond to the allegations in the United States' response. It and the letters from Salinas' mother will be addressed by separate order.

1

although the Court has considered Salinas' arguments therein as supplementing his earlier replies.  Finally, on May 10, 2010, the Court received from Salinas a letter in which he continues to complain of circumstances in his incarceration that he believes are unfair. (D.E. 118.)  His letter also makes repeated references to needing a lawyer.  (Id.)  To the extent this motion can be construed as requesting the appointment of counsel (D.E. 118), it is DENIED.

For the reasons set forth herein, the Court determines that no evidentiary hearing is needed in this case because an adequate record exists to address Salinas' claims.  In particular, a full record was made after trial and at sentencing regarding Salinas' claims that his trial counsel Pena suffered under a conflict of interest.  Based on that record and the filings of the parties in these § 2255 proceedings, the Court concludes that Salinas is not entitled to relief.  Accordingly, Salinas' § 2255 motion is DENIED.  The Court, however, GRANTS Salinas a Certificate of Appealability as to his claim that he received ineffective assistance of counsel due to counsel's alleged conflict of interest.

## I.  JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

## II.  BACKGROUND

### A.    Facts of the Offense[2]

Salinas was the driver and sole occupant of a tractor trailer that entered the U.S. Border Patrol checkpoint south of Falfurrias, Texas on June 15, 2007.    When first

---

[2]  Unless otherwise noted, the facts of the offense as set forth herein are derived from Paragraphs 5 through 7 of Salinas' Presentence Investigation Report ("PSR").

questioned, Salinas advised agents that he was taking a load of watermelons to Detroit, Michigan. Agents observed Salinas to be nervous, noting that he was continuously looking at the agent's canine in his side mirror. Salinas also advised agents that the trailer did not have a seal and that he did not load the trailer. Agents detected an odor of alcohol emitting from Salinas' breath and directed him to the secondary inspection area for further inspection.

Once in the secondary area, Salinas opened the trailer and agents began inspecting its contents. The trailer contained pallets of boxes loaded with watermelons that were stacked from floor to ceiling. The boxes in the trailer were unloaded and inspected and agents located 49 bundles of marijuana wrapped in clear plastic. The net weight of the marijuana was later determined to be 410.22 kilograms.

**B.      Criminal Proceedings**

On August 28, 2007, Salinas was charged in a two-count second superseding indictment. (D.E. 27.) Count 1ss charged him with conspiracy to possess with intent to distribute more than 100 kilograms of marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(B). (Id.) In Count 2ss, he was charged with possession with intent to distribute approximately 410 kilograms of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). (Id.) Salinas pleaded not guilty and proceeded to a jury trial. He was represented in all pre-trial proceedings and at trial by attorney Lionel Aron Pena.

The jury trial was held on November 6, 2007 and November 7, 2007. (D.E. 42, 47.) Salinas did not testify. The Court granted a defense motion for acquittal as to the conspiracy count, Count 1ss, but allowed the possession with intent to distribute charge, Count 2ss, to

go to the jury. (D.E. 86, Trial Transcript, Day 2, at 82-86.)  The jury returned a verdict of guilty as to Count 2ss.  (D.E. 54.)

### 1.    Conflict of Interest Allegations After Trial

Shortly after trial, but before sentencing, Salinas sent a letter to the Court in which he complained that his counsel, Pena, had a conflict of interest in the case.[3]  (D.E. 59, letter from Salinas to the Court.)  The Court held a hearing on December 11, 2007 to address the letter. At that hearing, the Court read the letter into the record.  (D.E. 70, Hearing Transcript ("12/11/07 Hrg. Tr.") at 2-4.)

In pertinent part, Salinas alleged that he thought Pena had a conflict because he knew the "Lopez brothers."  According to Salinas, the Lopez brothers were the source of the marijuana Salinas was hauling in the instant offense  (Id.)  Salinas' letter explained that on the first day that Pena came to meet him, Pena told Salinas that "if the Lopez boys from Edinburg" were involved  in the offense, that Pena already knew about them and about Salinas.  (Id. at 2.) Salinas' letter explained that about a month later, Pena asked Salinas "for some names" of people involved in the offense and that Salinas wrote the names of persons on Pena's manila folder.[4]  (Id.) Salinas complained, however, that Pena "never discussed the ways I could or could have downward departed table [sic] by cooperating with [AUSA]

---

[3]  In the week preceding the trial, the United States had filed a "Notice of Potential Conflict" in which the government alleged that counsel might have a conflict for completely different and unrelated reasons than those later alleged by Salinas and addressed herein.

[4]  Of course, if Pena already knew that the Lopezes were involved and had told Salinas that, as Salinas alleges, there would have been no reason for Pena to ask Salinas for "some names."

Patterson." (Id. at 3.) Salinas' letter alleged that "All along I have wanted to tell the Government everything I know, but I have not had the chance." (Id.) Salinas also alleged that the Lopezes had previously threatened him and his family and that the Lopezes had previously shown him pictures of what happened to "snitches." (12/11/07 Hrg. Tr. at 3-4.) Salinas' letter also complained that Pena did not allow him to testify at trial. (Id. at 5.)

After reading the letter into the record, the Court allowed the attorneys to respond. Pena spoke to the Court and said that most of what was in the letter was not true. (12/11/07 Hrg. Tr. at 4, 7-8.) He told the Court that Salinas had maintained his innocence until shortly before the end of trial, when Salinas first suggested to him that he was guilty of the offense. (Id.) Pena further claimed that he did not know that the "Lopez boys" were involved.[5] (Id. at 5, 6.) He told the Court that Salinas' mother at one point had told Pena that the Lopez boys "were in the dope business" but he did not know that they had any involvement in this specific case. (Id.) Pena was adamant that he did not know that Salinas was willing to admit his guilt at any point until near the close of trial. Pena further denied that he had kept Salinas from testifying. Pena stated, however, that he could not continue as counsel for Salinas at this point because he did represent one of the Lopezes several years prior in an "unrelated case." (Id. at 7.)

---

[5] The Court finds it strange that, by Pena's own admission, he learned of the potential conflict near the end of the trial, on November 7, 2007, when Salinas told him the Lopez brothers were involved in this specific offense (see infra at 18-19 (discussing Pena's testimony on this issue)), but yet Pena made no effort to inform the Court at all of the conflict in the month between trial and the date Salinas brought the issue to the Court's attention by writing the letter received by the Court on December 3, 2007.

After Pena asked to be excused and Salinas asked for another lawyer, the Court excused Pena and appointed Richard Rogers to represent Salinas.  (<u>Id.</u> at 8-9.)  The Court did not make an explicit finding at that time that there had been any possible or actual conflict of interest in the case.

### 2.    Salinas' Attempts to Debrief and Sentencing

At some point after that hearing, when Salinas was now represented by new counsel, Salinas attempted to debrief with the United States.  While some of the information Salinas provided appeared truthful, there were other matters on which he appeared to be untruthful.  He was deemed not to be a credible witness by the case agent and the United States.  (S. Tr. at 34-35, 37 (agent's testimony to that effect); <u>id.</u> at 53 (prosecutor referring to Salinas as a "habitual liar").)

The PSR found that Salinas' base offense level was 28.  (PSR at ¶ 14.)  The PSR did not recommend any adjustments and explicitly recommended that Salinas not receive any adjustment for acceptance of responsibility. (PSR at ¶ 20.)   The total offense level was 28.  When coupled with his criminal history category of II (PSR at ¶¶ 28, 50), Salinas' resulting advisory guideline range for the offense was 87 to 108 months. (PSR at ¶ 50.)

At the initial call for sentencing on February 28, 2008, Salinas' new counsel,  Rogers, argued that Salinas should be entitled to a credit for acceptance because the only reason he did not plead guilty was because his counsel had a conflict of interest.  Rogers argued that counsel discouraged Salinas from pleading guilty or from cooperating in order to protect

6

Derek Lopez,[6] who Pena had previously represented and who allegedly was involved in the instant offense as a supplier of the marijuana and/or the person who arranged for Salinas to transport the marijuana. (See generally D.E. 87.)   The Court heard testimony from Salinas and Salinas' mother regarding their conversations with counsel, although Pena did not testify at that time.

The Court asked the attorneys to file briefs addressing whether the issue of ineffective assistance of counsel due to a conflict of interest could be resolved after verdict and before sentence and what the remedy would be if the Court were to find ineffective assistance. (D.E. 87 at 24-25.)  The written briefs were filed (D.E. 73, 74) and the case was re-called for sentencing on March 26, 2008.

At sentencing, the Court took testimony on the conflict of interest issue, from both Pena, who was cross-examined by Salinas' new counsel, and from the case agent to whom Salinas attempted to debrief.  (See generally D.E. 88, Sentencing Transcript ("S. Tr.").) The Court also heard testimony again from Salinas' mother and from Salinas.  (See id.)  Finally, the Court heard arguments from counsel.  (S. Tr. at 47-54.)

The testimony and argument was considered in the context of determining whether Salinas should receive acceptance of responsibility.  Essentially, Salinas was arguing that, had his counsel not had the conflict of interest, counsel would have allowed Salinas to plead

---

[6] While locating the record of the case in which Pena previously represented this individual, the Court discovered that the correct spelling is "Derrick Lopez."  Nonetheless, the Court uses "Derek" in this Order, since that is the spelling that appears throughout the transcripts in the instant case.

guilty as Salinas wanted to, and Salinas would have received acceptance of responsibility.

At the March 26, 2008 sentencing, the Court repeatedly stated that it did not find Salinas to be at all credible. The Court's explicit findings and conclusions as to the potential conflict were as follows:

> Well, it's pretty hard to tell what happened here. If I analyze this like I think I should, seems to me that it's pretty hard to tell who's telling the truth.
>
> Mr. Pena's pled an awful lot of people guilty in my court. He's tried cases in my court. Whether or not he tries a case doesn't adversely affect the Defendant's potential substantial assistance on a later occasion. The Defendant did not testify. He did not destroy his own credibility. So the issue would deal with whether or not there would be much likelihood of acceptance of responsibility.
>
> My inclination is to think that it's likely that Mr. Pena knew of the existence of the Lopezes during this matter. I am inclined to believe that he did because of his representations of the Lopez brothers, I don't know whether it was one or more, that began in the midwest and came down to Judge Hinojosa's Court, because there were records in that case that reflected that Noe Salinas was involved.
>
> So the association was likely there. I think that even if he didn't know, it was a logical question to inquire whether or not the Salinas (sic) brothers were involved, and that's what Ms. Lopez -- Ms. Salinas -- I mean, the Lopez brothers were involved, and Ms. Salinas in fact said she asked that question, and he affirmed it.
>
> On the other hand, I have my case agent, and the case agent says that ... Mr. Salinas is a significant stranger to the truth. Now, the case agent doesn't have any motivation to say that, because when the case agent says that, he loses a witness, or at least the likelihood of a witness, that he could use in some future trial. ...
>
> But when he says, "I can't rely on him," then I have to believe that that is the agent's assessment of Mr. Salinas and his desire to tell the truth.
>
> That leaves us to this point, that in fact I believe that Mr.

8

> Pena knew of or suspected of the presence of the Lopezes, but I also believe that Mr. Salinas did not request a plea of guilty. There was no real reason for Mr. Pena not to have helped him with that, because he then would have been in exactly the same position. There's no assurance that because there's a trial that Mr. Salinas isn't going to turn right around and provide substantial assistance. The plea of guilty versus the trial doesn't affect that opportunity and those abilities to have conversations with the case agent.

(D.E. 88, Sentencing Transcript ("S. Tr.") at 54-55.)

The Court later stated that there was certainly a "potential" conflict and that, had Pena's prior representation of a Lopez brother been brought to the Court's attention earlier, Pena would have been excused. But the Court plainly stated that it did not believe Salinas when he told the Court that he wanted to plead guilty. (S. Tr. at 68-69.) The Court explained:

> [addressing Salinas]... I'm saying I don't believe what you just told me about what you would have done.
>
> I think you were perfectly content to know that he knew the Lopezes. I think you were perfectly happy with that, and that you proceeded to trial here hoping that you would be found guilty (sic) because they were not here to implicate you, and because nobody else was here to implicate you, and the evidence you said was fairly thin. And you were hoping for some good evidentiary rulings, and you got them. And the jury saw through you and the Government's case and found you guilty.
>
> So don't tell me that, "Oh, I would have [pleaded guilty], had I known about this conflict of interest," because I don't believe that.

(S. Tr. at 68-69.) The Court also expressed that it thought Salinas was not being truthful about other matters.[7]

---

[7] For example, early in his testimony at sentencing, Salinas told the Court that in 1981, at Pena's assistance, he (Salinas) had taken "the rap" for a crime of theft committed by Pena's son, even though Salinas "had nothing to do with it." (S. Tr. at 46-47.) Later, Salinas indicated that the

Based on the record before it, the Court concluded that Salinas had not accepted responsibility for his crime and thus was not entitled to an adjustment for acceptance of responsibility.  The Court sentenced him to the low end of the applicable guideline range, 87 months in the custody of the Bureau of Prisons, to be followed by a five-year term of supervised release.  (D.E. 75, 77.)  Judgment was entered on March 28, 2008.  (D.E. 77.) Salinas appealed, and the Fifth Circuit issued a per curiam opinion affirming his conviction and sentence on January 27, 2009. (D.E. 100.)

On appeal, Salinas argued that the Court erred in denying him a reduction for acceptance of responsibility.  The Fifth Circuit noted that Salinas had argued that his cooperation with authorities was hindered by his attorney's conflict of interest, but ultimately concluded that this Court did not err in declining to adjust his offense level for acceptance of responsibility.  (D.E. 100.)  The Fifth Circuit thus affirmed in a per curiam opinion issued January 27, 2009.  (Id.)

Salinas' letters to the Court followed, which the Court construed as a § 2255 motion. (D.E. 104, 105.)  His § 2255 motion is timely.

### III.  MOVANT'S ALLEGATIONS

Salinas' motion raises two basic arguments in support of his claim that his sentence should be reduced or that he should be re-sentenced.  (See D.E. 104, 105.)  First, he alleges

---

items stolen in that burglary were ultimately found in Salinas' house, but that he did not actually enter the burglarized house to steal the items.  (S. Tr. at 59-60.)  As the Court pointed out, either Salinas lied to the judge he pleaded guilty to concerning the facts of the theft offense, or he was lying to this Court at his sentencing in this case.  (S. Tr. at 59-62.)

that he was denied effective assistance of counsel because of Pena's alleged conflict of interest. As he did at sentencing, he contends that Pena discouraged him from pleading guilty and from cooperating. He argues that Pena's actions were the direct result of divided loyalties, and that he (Salinas) would have pleaded guilty had he received conflict-free representation.

Second, Salinas contends that the Court misapplied the Guidelines by failing to grant him acceptance of responsibility, based on the alleged conflict of interest.

## IV.  ANALYSIS

### A.    28 U.S.C. § 2255

There are four cognizable grounds upon which a federal prisoner may move to vacate, set aside or correct his sentence: (1) constitutional issues, (2) challenges to the district court's jurisdiction to impose the sentence, (3) challenges to the length of a sentence in excess of the statutory maximum, and (4) claims that the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255; United States v. Placente, 81 F.3d 555, 558 (5th Cir. 1996).  "Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice."  United States v. Vaughn, 955 F.2d 367, 368 (5th Cir. 1992).

### B.    Ineffective Assistance of Counsel

### 1.    Conflict of Interest -- General Standards

In United States v. Culverhouse, 507 F.3d 888 (5th Cir. 2007), an appeal from the

denial of a § 2255 motion, the Fifth Circuit summarized the legal principles governing claims

of ineffective assistance of counsel based on a conflict of interest:

> The Sixth Amendment right to counsel includes the "right to representation that is free from any conflict of interest." ... To prove a Sixth Amendment violation based on a conflict of interest arising from multiple representation, <u>Cuyler v. Sullivan</u> requires a defendant to show: (1) that his counsel was acting under the influence of an actual conflict that (2) adversely affected representation. <u>See</u> <u>Cuyler</u>, 446 U.S. 335, 348-49 (1980). The defendant need not show prejudice in the sense that the outcome of the proceeding would have been different absent the conflict because prejudice is presumed upon a showing of an actual conflict that adversely affected representation.

> Multiple representation does not necessarily create an actual conflict of interest. We have noted that the first prong of <u>Cuyler</u> requires a defendant to show something more than a speculative or potential conflict. As such, we have stated that a conflict will exist only when counsel is "compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client."

507 F.3d at 892 (some citations omitted).

Additionally,

> "[a]dverse effect" may be established with evidence that "some plausible alternative defense strategy or tactic" could have been pursued but was not because of the actual conflict impairing counsel's performance.

<u>Perillo v. Johnson</u>, 205 F.3d 775, 781-82 (5th Cir. 2000)(internal citations omitted); <u>see also</u>

<u>Beathard v. Johnson</u>, 177 F.3d 340, 346 (5th Cir. 1999)(same).

If a defendant shows that his attorney's conflict of interest actually affected the

adequacy of his representation, then he need not demonstrate prejudice before he may obtain relief.  Cuyler, 446 U.S. at 349-50.  If he cannot make such a showing, then the claim should be analyzed under the standard set forth in Strickland v. Washington, 466 U.S. 668 (1984), which requires the movant to prove both that counsel's representation fell below an objective standard of reasonableness and prejudiced his case.  See Cuyler, 446 U.S. at 349-50.

Although the Supreme Court has never held the Cuyler standard applicable in cases of *successive* representation, as opposed to cases of simultaneous multiple representation, the Fifth Circuit has applied Cuyler to cases of successive representation and this Court is bound by that.  Compare Mickens v. Taylor, 535 U.S. 162, 174-76 (2002) (noting that the high court has never extended Cuyler to cases of successive representation and expressing concern about whether Cuyler or Strickland provides the proper standard for resolving conflict-of-interest claims involving successive representation) with United States v. Infante, 404 F.3d 376, 391 n.12 (5th Cir. 2005) (recognizing the foregoing statements in Mickens, but holding that "we continue to be bound by circuit precedent applying Cuyler to cases of successive representation.").

### 2.    Application to Salinas' Case

Applying Cuyler to the case at hand, the Court must determine first whether there was an actual conflict of interest, as opposed to merely a hypothetical one, and second, whether Pena's representation of Salinas was adversely affected by that conflict.

### a.    "Actual Conflict"

The evidence in this case is murky as to whether there was an actual conflict of

13

interest.  Notably, all of the individuals involved in the alleged conflict of interest reside in Edinburg, Texas and they or their families have known each other for many years.  Pena testified that he had known Salinas "probably since [Salinas] was born," and that the Lopez brother he had previously represented had a father who was a barber in Edinburg where the Lopezes, Salinas and his family, and Pena apparently all reside.  He testified that Salinas had "grown up" with Pena's sons.  (S. Tr. at 17; id. at 27 (stating that the Lopezes and Salinas "all ran around together growing up in school").  By all accounts, Salinas' family and the Pena family knew each other well.  (See, e.g., 12/11/2007 Hrg. Tr. at 62, (Salinas describing Pena's son Eric as a "good friend"); id. at 39 (Salinas' mother testifying that her family had "known Mr. Pena for a long time" and hired him to represent Salinas).)  The mere acquaintance or friendly associations between Pena and the Lopez family is insufficient to establish a conflict.

The Court also questions whether there was an actual conflict based on the timing of Pena's representation of Lopez and Salinas.  That is, Pena testified before this Court that he had represented Derek Lopez  "five, six, seven years ago" in a criminal case in which Lopez was accused of being part of a drug trafficking conspiracy with some people from Michigan. (S. Tr. at 24.)[8]  Pena further testified that he had not had any contact with Derek after he was

---

[8]  Based on its search of Southern District of Texas records, the Court believes the case is United States v. Derrick Lopez, No. 7:04-cr-187, which was  transferred from the Eastern District of Michigan and handled by United States District Judge Hinojosa in the McAllen division of this Court.  The docket in that case reflects that Lopez was represented by L. Aron Pena in that case. There is currently a pending petition for revocation of supervision in the case, but Lopez has been represented in the revocation proceedings not by Mr. Pena, but by appointed counsel.  (See generally docket in United States v. Lopez, No. 7:04-cr-187.)  According to the docket sheet, the last time

14

discharged from the sentence imposed in that case.  (S. Tr. at 24.)  Pena testified that Lopez's father was a barber in Edinburg and, when getting a haircut, Pena had inquired with Derek's father about how he was doing, but that he "never saw Derek again personally, officially or unofficially, ever since."  (S. Tr. at 25.)  The only other connection Pena had to the Lopez family is that, more than 30 years ago, Pena sold the Lopez father, David Lopez, a house in downtown Edinburg.  (S. Tr. at 25-26.)  Salinas offered nothing to contradict the testimony that Pena had no ongoing relationship, legal or otherwise, with his former client, Derek Lopez, and he does not offer anything now.  The Court has no reason to disbelieve Pena's testimony on that issue.

If, as Pena contends, he had no knowledge of the Lopezes' involvement in the instant offense until near the end of the trial, then any conflict necessarily did not have an adverse affect on his representation with regard to his counseling Salinas on the merits of a trial versus a guilty plea.  There is conflicting evidence, however, as to whether and at what time Pena knew or did not know that the Lopezes were involved in this offense.  On the one hand, both Salinas and Salinas' mother testified that Pena knew the Lopezes were involved in the offense from the time he first met with Salinas.  Pena, in contrast, stated that Salinas had steadfastly maintained his innocence up through and including the beginning of the trial and thus, that he didn't "know of any proper, possible confederates of his."  (S. Tr. at 19.)  Pena's claim that he was unaware of the Lopez' brothers' involvement until the end of trial is belied by Pena's admission that Mrs. Salinas had told Pena that the "Lopez brothers" were dope

--------------------------------------------------------------------

Pena appeared in that case to represent Lopez was at sentencing, which occurred August 9, 2004.

dealers.  According to Pena, he understood that to mean that they were drug dealers generally and not that they had any specific involvement in the instant case.   It seems strange to the Court, however, that Mrs. Salinas and Pena would be discussing the Lopezes involvement in the drug trade at all, if it did not relate in some way to Salinas' case.

Moreover, there were internal inconsistencies in Pena's own testimony as to when he learned that the Lopezes had any involvement in this case.  (Compare, e.g., S. Tr. at 20 (Pena's testimony that when a witness came in to testify on Salinas' behalf on the last day of trial, Salinas told Pena not to call the witness because he would not be favorable and would "testify about a conspiracy involving me and the Lopezes") with S. Tr. at 27-28 (Pena's testimony upon cross-examination denying that Salinas has said anything about the Lopezes at trial, but then admitting that Salinas "might have mentioned the Lopezes in the conspiracy.").

The Court found on the record that Pena likely knew either that his former client, Derek Lopez, was involved in the instant offense or that he may have been involved. (S. Tr. at 54-55.)   This finding is bolstered not only by Pena's admission that he discussed the Lopez brothers being dope dealers in an early conversation with Mrs. Salinas, but also by the case agent's testimony concerning the record in the Michigan case in which Lopez was represented by Pena.  Specifically, the agent testified that he had found some "paperwork" that Derek Lopez had debriefed to agents in Indiana and told those agents that Salinas was one of his main drivers transporting drugs, and that was in 2001 or 2002, to the area up there in Indiana.  (S. Tr. at 35.)   Upon redirect, the agent stated that the debriefing occurred " in

16

connection with the prosecution that [Lopez] had in Michigan" and that it was a "known fact" during that prosecution that "Salinas worked for Derek." (S. Tr. at 38.)

Although Pena denied that he had any knowledge of drug-running ties between Lopez and Salinas until Salinas mentioned it at the end of trial, the fact that the information was in the record in the very case in which Pena previously represented Lopez makes it likely that Pena did have knowledge of a connection between Lopez and Salinas with regard to illegal activities. If Pena was present at any of Lopez's debriefings or Salinas' name was mentioned in Lopez's Presentence Investigation Report, Pena should have known it.

Assuming Pena knew of Lopez's possible involvement in the instant offense, t is possible that his current client's interests could have diverged with his former client's interests. That is, Salinas stood to benefit from debriefing early in the case against Lopez. If he had done so, however, it obviously would have been harmful to Lopez. Indeed, if Salinas' allegations against Lopez are to be believed, then a debriefing by Salinas could have resulted in charges being brought against Lopez. Certainly then, there was a ***potential*** for divided loyalties. Whether Pena in fact had divided loyalties and an "actual conflict" is less clear. Notably, there is nothing to refute Pena's testimony that he had not spoken to Derek in years. Whether Pena would have felt an obligation to "protect" a former client with whom he'd had no contact in years at the expense of his current client is questionable.

In summary, whether Pena felt any divided loyalties is a very difficult question. The Court need to answer it, however, because even assuming *arguendo* that there were such a conflict, Salinas has failed to show an "adverse effect" as required to obtain relief. See

Perillo, 205 F.3d at 781.

### b.    Adverse Effect on Counsel's Representation

As noted, it is not enough to show divided loyalties, but a § 2255 movant alleging a conflict of interest must also show that an alternative strategy existed that Pena did not pursue because of the conflict.  See id.   In the context of this case, Salinas must show that an alternative strategy during plea negotiations existed which would have resulted in Pena convincing Salinas to plead guilty.

Put differently, Salinas has not demonstrated an "actual" conflict of interest because he fails to establish that Pena was "compelled to compromise" his representation of Salinas during the plea negotiations because of his prior representation of Lopez.  See Culverhouse, 507 F.3d at 892.  Salinas argues that Pena's prior representation of him harmed him because counsel did not strongly advise him to plead guilty and instead encouraged him to go to trial, telling him he had a 70 percent chance of winning at trial.  (D.E. 104, 105; see also S. Tr. at 48 (Salinas' sentencing counsel summarizing argument, and stating that if he had had conflict-free counsel, Salinas "could very well have pled guilty.  That attorney could have twisted his arm and said, 'You're going to get found guilty.  You need to plead guilty.'  And then not made him appear to be this big liar and open the door for him to be able to put these Lopez, these Lopez brothers, long time drug traffickers, behind bars.  And it didn't happen.").

The reason the Court denies Salinas' claim, however, is that he Court does not believe that Pena failed to pursue a strategy of trying to encourage Salinas to plead guilty.  The Court

finds Pena's testimony that he tried to encourage Salinas to plead guilty to be believable.

The Court also believe Pena's testimony that Salinas implicated himself for the first time to Pena during trial and believes Pena's testimony that Salinas never indicated any intent to plead guilty.[9]  This explains Pena's trial decision, which appears to have been made at the last minute, not to call the Canos.  Additionally, Pena's expressions of surprise when he testified about this issue at sentencing appeared sincere and genuine.  In light of his client's unwillingness to plead guilty and his professions of innocence, there was little else Pena could have done, and certainly no "alternative" strategy that could have been pursued.

Moreover, the mere fact that Salinas proceeded to trial would not, as he seems to imply, protect the Lopez brothers.  Indeed, as occurred here, a defendant could debrief at any point after trial and implicate others in an attempt to help himself.  Thus, if Pena strongly encouraged Salinas to proceed to trial instead of pleading guilty in an attempt to protect the Lopez brothers or to "blend divergent interests," it was a misguided attempt.  Put differently, the fact that Salinas proceeded to trial instead of pleading guilty would not help either client, if Pena truly thought Salinas was guilty and/or would be found guilty.

---

[9]  In support of his testimony that Salinas maintained his innocence until the end of trial, Pena has attached to his affidavits various hand-written notes from Salinas.  According to Pena, these notes "direct me to go to trial with his case."  (D.E. 113 at Ex. 1.)  The notes that Pena now presents, which appear to be notes from Salinas setting forth possible defense strategies, could certainly be interpreted as asserting Salinas' innocence.  They could also be interpreted, however, as simply statements showing how best to hold the United States to its burden of proof, and not a claim of "innocence."  Thus, the Court does not find them to be any sort of "smoking gun," as Pena apparently believes.

The court further notes that this was a trial in which Pena represented his client well. New defense counsel, Rogers, told the Court at sentencing that there was no contention that the alleged conflict had any impact on the jury trial or on Pena's trial tactics or decisions. (S. Tr. at 3-4.)  Indeed, even now Salinas does not make any suggestion that any of Pena's conduct *at trial* was the result of the alleged conflict.  He does not allege that Pena did or did not do anything at trial that was the result of the alleged conflict.[10]

In sum, this Court conducted an extensive inquiry into Salinas' claim of conflict and found that a potential conflict existed.  Notably, however, the Court finds that Salinas has not shown that Pena's conflict of interest actually affected the adequacy of his representation. In short, in order for Cuyler to apply, Salinas must meet his burden of showing that the adequacy of Pena's representation was affected or that there was a "plausible alternative defense strategy or tactic" that could have been pursued, but was not.  See Perillo, 205 F.3d at 781-82.  This is a showing that Salinas has not made.  Nor can he show that Pena's "judgment was actually 'fettered by concern' over the effect of certain ...decisions on other clients."  See id. 205 F.3d at 807 (citation omitted).  Having reviewed the entirety of the record in this case, the Court concludes that Salinas has not met his burden of showing an adverse effect on his counsel's representation.  Accordingly, his ineffective assistance of counsel claim must meet the requirements of Strickland and is properly analyzed under

---

[10]  In his letter, Salinas argued that Pena prevented him from testifying, but the Court had asked Salinas at trial about his decision not to testify and he told the Court it was his own decision, that he did not want to testify and that no one was keeping him from testifying.  (D.E. 86, Trial Transcript, Day 2, at 86-87.)  The Court does not believe Salinas' allegation now that Pena kept him from testifying.

Strickland.

Under Strickland, Salinas must demonstrate that his counsel's representation both fell below an objective standard of reasonableness and prejudiced his case.  In this case, the Court has already found that Salinas cannot demonstrate prejudice, and it is therefore unnecessary to address Strickland's reasonableness prong.  In order to establish prejudice when a defendant claims his counsel was ineffective with regard to the plea agreement or plea negotiations, he must show a reasonable probability that, absent counsel's errors, he would have pleaded guilty instead of proceedings to trial and that he would have received a lesser sentence.  See United States v. Grammas, 376 F.3d 433, 438-39 (5th Cir. 2004);  see also  United States v. Herrera, 412 F.3d 577, 582 (5th Cir. 2005) (remanding for an evidentiary hearing to determine whether defendant relied on counsel's alleged misrepresentations in rejecting a plea offer).

As noted, the Court does not believe that Salinas ever intended to or would have pleaded guilty to this offense.  Thus, he cannot establish prejudice.  His claim fails.

## C.    Claim That Court Erred At Sentencing

Construed liberally, Salinas' § 2255 motion also asserts a claim that this Court erred in not giving Salinas an adjustment for acceptance of responsibility.  As an initial matter, claims that the Court erred in applying the sentencing guidelines are not cognizable in § 2255 proceedings. See United States v. Payne, 99 F.3d 1273, 1281-82 (5th Cir. 1996) ("A district court's technical application of the Guidelines does not give rise to a constitutional issue") (quoting United States v. Vaughn, 955 F.2d 367, 368 (5th Cir. 1992); United States v.

21

Williamson, 183 F.3d 458, 462 (5th Cir. 1999) (a district court's alleged misapplication of the sentencing guidelines cannot be challenged in a § 2255 motion).

Moreover, this precise claim has already been considered and rejected by the Fifth Circuit.  (D.E. 100.) It has long been "settled in this Circuit that issues raised and disposed of in a previous appeal from an original judgment of conviction are not considered in § 2255 Motions." United States v. Kalish, 780 F.2d 506, 508 (5th Cir. 1986) (affirming district court's refusal to entertain the defendant's § 2255 motion); see also United States v. Webster, 421 F.3d 308, 310 n.7 (5th Cir. 2005) (citing to Kalish and noting the rule).  Thus, the claim is not properly before the Court and the Court will not address it.  See Kalish, 780 F.2d at 508.

## D.    Certificate of Appealability

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability."  28 U.S.C. § 2253(c)(1)(A).  Although Salinas has not yet filed a notice of appeal, the § 2255 Rules instruct that this Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11, § 2255 RULES.  Thus, the Court turns to whether Salinas is entitled to a COA.

A COA "may issue...only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  "The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits."  Miller-El v. Cockrell, 537 U.S. 322, 336 (2003).

22

To warrant a grant of the certificate as to claims denied on their merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  This standard requires a § 2255 movant to demonstrate that reasonable jurists could debate whether the motion should have been resolved differently, or that the issues presented deserved encouragement to proceed further.  United States v. Jones, 287 F.3d 325, 329 (5th Cir. 2002) (relying upon Slack, 529 U.S. at 483-84).

The Court concludes that reasonable jurists could debate this Court's resolution of Salinas' claim that his counsel rendered ineffective assistance of counsel based on a conflict of interest.  In particular, the possibility of a conflict of interest leads the Court to conclude that additional review is warranted.  That is, the issues presented deserve encouragement to proceed further.  Miller-El, 537 U.S. at 327 (citing Slack, 529 U.S. at 484).

While the Court is confident in the ultimate credibility determinations it made, review by the appellate court of this Court's determinations will help ensure that Salinas receives full consideration of his claim.  Accordingly, Salinas is GRANTED a COA only as to his claim that  he was denied effective assistance of counsel due to his trial attorney's conflict of interest.  As to his other claim, the Court denies Salinas a COA because he has not met the standards set forth above.

## V.  CONCLUSION

For the aforementioned reasons, Salinas' motion for release pending appeal (D.E. 116) and his motion for appointment of counsel (D.E. 118) are both DENIED.  Salinas'

motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 (D.E. 104, 105) is also DENIED.  Salinas is GRANTED a Certificate of Appealability as to his claim that he received ineffective assistance of counsel based on counsel's alleged conflict of interest.

It is so ORDERED this 24th day of June, 2010.

HAYDEN HEAD
SENIOR U.S. DISTRICT JUDGE